Jacob M. Downs, WSBA #37982
Joseph P. Corr, WSBA #36584
CORR|DOWNS PLLC
100 W Harrison St, Suite N440
Seattle, WA 98119
(206) 962-5040
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

NICOLE K. DRUMHILLER,

Plaintiff,

v.

AMERICAN PUBLIC UNIVERSITY SYSTEM, INC.,

Defendant.

NO.

**COMPLAINT**

**JURY DEMAND**

Plaintiff Nicole K. Drumhiller ("Plaintiff" or "Drumhiller") alleges as follows:

**NATURE OF THE ACTION**

This is an action under RCW 49.60.210, Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, and Wrongful Discharge in Violation of Public Policy. Plaintiff seeks economic and equitable relief to redress being wrongfully terminated and retaliated against for being a victim of sexual harassment and participating in a sham investigation conducted by Defendant.

## I. JURISDICTION AND VENUE

1.1 Pursuant to 28 U.S.C. §§1331, 1343(a)(3) and (a)(4), and 28 U.S.C. §1367 this Court has jurisdiction over Plaintiff's claims.

1.2 Pursuant to 28 U.S.C. §1391(b) jurisdiction is proper in the United States District Court for the Eastern District of Washington.

## II. PARTIES

2.1 Plaintiff is and has been at all times material to this lawsuit a resident of Pullman, Washington.

2.2 Defendant is and has been at all times material to this lawsuit headquartered in Charles Town, West Virigina, and conducted business throughout the United States through its online platform.

## III. FACTS

3.1 Nicole Drumhiller, a citizen of Washington State, most recently served as Dean of the School of Security and Global Studies (SSGS) with APUS. She worked for APUS for nearly 11 years in a variety of roles.

3.2 At times relevant to this suit, Ms. Drumhiller was also a student enrolled in courses with APUS.

3.3 During her employment with APUS, she never received any discipline or performance improvement counseling.

3.4 Much to her surprise and dismay, after discussing with APUS's director of human resources the disturbing events that occurred on June 8, 2023, where she was victimized by an APUS Vice President while attending an APUS event in Fort Washington, Maryland, APUS abruptly terminated her employment in violation of Washington State and federal law.

### A. An APUS Vice President Approaches Ms. Drumhiller on the Evening of June 8, 2023.

3.5 On the evening of June 8, Ms. Drumhiller attended two APUS events held at the Gaylord National Resort and Convention Center in Fort Washington, Maryland. The events included the #BeGreat Nominee Meet & Greet, and the #BeGreat dinner.



CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

3.6 Like several other attendees, Ms. Drumhiller did consume alcoholic beverages that were offered and provided at both events. At the #BeGreat meet and greet event, she specifically recalls a brief interaction with APUS's Vice President of Finance ("Vice President") who was also a former associate of President Nuno Fernandez.

3.7 During their short interaction, the Vice President grazed Ms. Drumhiller's arm and asked: "[d]o you always look like this?" Taking his physical contact and comment as unwanted flirtation, Ms. Drumhiller thought his actions were very aggressive and strange given that she had no prior direct interaction with him beyond a few email exchanges and seeing him as a participant in virtual meetings. Following the #BeGreat dinner, Ms. Drumhiller went to her room and changed clothes.

**B. Ms. Drumhiller Awakes to Confusion, Sickness, and Loss of Memory.**

3.8 The next memory Ms. Drumhiller has after returning to her room to change clothes is waking up in her hotel room on the morning of Friday, June 9, 2023.

3.9 Ms. Drumhiller was awoken by a phone call from APUS employee Kate Brannum asking about her whereabouts. Ms. Drumhiller was completely disoriented, had difficulty speaking, and felt unwell with extreme sensitivity to light akin to a severe migraine. Ms. Drumhiller, who is a casual drinker, had never before experienced similar feelings after consuming alcohol. She was terrified and was immediately anxious about missing both the APUS convocation scheduled for that morning and possibly other APUS events that day due to her symptoms.

3.10 As Ms. Drumhiller attempted to ready herself for the APUS Provost Luncheon, she noticed her credit card was missing, which seemed strange and



CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

alarming. She had difficulty walking to the lunch event. Once there, she was essentially forced to remain seated given her symptoms.

3.11 During the luncheon, she asked a colleague about the events of the night before. He responded that he had not seen her but asked about whether she could have been "given something" because she was noticeably unwell and had symptoms of having been drugged. Other colleagues have also since confirmed that Ms. Drumhiller appeared noticeably and uncharacteristically unwell at the luncheon.

3.12 Following the luncheon, Ms. Drumhiller rested and recovered in her hotel room. She then attended the APUS Memorial Tea event during which time her symptoms persisted. During that event, her colleagues continued to express concern about her wellness. At the conclusion of the Memorial Tea, she walked briefly through the GradFest event where she felt dizzy and promptly returned to her hotel room. After her symptoms began to improve, she attended the Graduate Welcome Reception that evening and then joined other faculty members in the Belvedere lobby bar lounge.

3.13 While socializing with her colleagues in the lobby bar area, Ms. Drumhiller was informed that another colleague had been injured on the hotel's escalator and transported to the hospital for stiches. She and other colleagues waited in the lobby for his return. At some point, the Vice President joined them. This was the first time she recalled any interaction with him since he had touched her arm and made the inappropriate comment about her appearance the night before. Ultimately, they did not see the injured colleague return, and Ms. Drumhiller returned to her hotel room for the night.



CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

## C. Ms. Drumhiller Attends all University Events, and Hears from Human Resources for the First Time on June 12.

3.14 On Saturday, June 10, Ms. Drumhiller attended all graduation festivities. The following day, the APUS team transferred to another hotel to hold a series of meetings, which she attended in full. That night, she does recall experiencing a nightmare and had to sleep with the hotel light on.

3.15 On Monday, June 12, the Vice President approached her between meetings to ask if they could chat briefly. He mentioned that he had a conversation with human resources about the evening of Thursday, June 8. At that time, the only contact Ms. Drumhiller recalled having with him on Thursday was at the #BeGreat meet and greet where he made her feel uncomfortable by grazing her arm and commenting about her appearance. He did not share any specifics of what he discussed with human resources.

3.16 Later that day, Ms. Drumhiller received an email from Mauricia Blackwell in APUS human resources that vaguely asked her to discuss the events of June 8. When the two connected over the phone, Ms. Blackwell mentioned that she knew Ms. Drumhiller had "gone out" on June 8 and wanted to know if everything was "consensual." Ms. Blackwell provided no context for the question asked or explanation as to the reason for the call. Moreover, she did not mention the Vice President's name or suggest the conversation had anything to do with interactions Ms. Drumhiller may have had with him.

3.17 Still not knowing what had occurred the night of June 8, Ms. Drumhiller responded that she had gone out (which she knew from her credit card transactions but did not recall), that she was OK, and that she assumed her presence out was consensual. Ms. Blackwell then ended the call without providing any additional information despite knowing much more about what



CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

occurred on the night of June 8 and knowing that the Vice President and Ms. Drumhiller were still located in the same hotel.

3.18 That evening, Ms. Drumhiller heard someone shouting near her hotel room who sounded like the Vice President. At this point, not knowing the full extent of what had occurred on June 8, Ms. Drumhiller became uncomfortable with the situation. She began taking the stairs from the fifth floor to avoid any one-on-one contact with him. She never saw him again and did not have any further contact with him.

**D. Ms. Drumhiller Finally Learns She was a Victim and Had Been Taken Advantage of by the Vice President.**

3.19 The next day, on Tuesday, June 13, Ms. Drumhiller received another email request from Ms. Blackwell to speak again because an undisclosed member of the leadership team reported that Ms. Drumhiller, on the evening of June 8, commented: "If [the Vice President] doesn't accost me again…" Given that Ms. Drumhiller was still experiencing memory loss and was confused by the phrasing of Ms. Blackwell's email, she was understandably disturbed. Ms. Drumhiller agreed to meet with Ms. Blackwell the following day.

3.20 On Wednesday, June 14, Ms. Drumhiller met with Ms. Blackwell after the APUS meetings concluded. Ms. Blackwell stated that she wanted to talk with Ms. Drumhiller again because she felt like something was wrong.

3.21 During the conversation, Ms. Drumhiller mentioned having no memory of the events that transpired after the #BeGreat dinner and did not recall making the comment about the Vice President accosting her. But she did acknowledge that was strong language for her and not a comment she would have made lightly, especially in a workplace setting. Given her lack of memory, she mentioned being concerned about retaliation but wanted to be forthcoming about



CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

what she could recall in case there was a pattern of behavior with the Vice President. Ms. Drumhiller cooperated fully with Ms. Blackwell.

3.22 Ms. Blackwell then asked Ms. Drumhiller if she even knew what had transpired. She did not. For the first time, Ms. Blackwell informed her that that another APUS leader had seen the Vice President kissing Ms. Drumhiller in a bar across the street from the hotel and that a photo had been taken showing it in the background.

3.23 Ms. Drumhiller was immediately distraught and felt violated, embarrassed, and humiliated as that was not something she would have done of her own volition. Indeed, she is a happily married woman in a monogamous relationship with her husband of nine years.

3.24 This news was also startling given that six days had passed since that event, and this was the first time that anyone from APUS informed her about what they already knew regarding her victimization.

3.25 Ms. Drumhiller recounted to Ms. Blackwell how people had approached her during the different events that occurred on Friday, June 9, who asked if she had been "given anything," i.e., drugged. Ms. Blackwell also asked if Ms. Drumhiller if she thought she could have been given something, which Ms. Drumhiller agreed seemed likely given her symptoms. Ms. Drumhiller also reported she had a strange recollection from that evening, which she was not sure was a dream or reality, of someone standing over her where she had a visceral drawn-back feeling. Ms. Blackwell told Ms. Drumhiller that APUS needed to respond and mentioned it being "a liability".

3.26 Ms. Blackwell again pressed Ms. Drumhiller about whether the interaction with the Vice President was consensual. Ms. Drumhiller reiterated that she had no memory of the event so could not in good faith say either way, but it was not behavior to which she would have consented. She also repeated that



CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

the behavior was very troubling as it was out of character for her. Ms. Blackwell also agreed that the reported behavior seemed very unusual and far outside Ms. Drumhiller's normal behavior.

3.27 Ms. Blackwell went on to explain that the Vice President was able to recall the events of that evening, and it was concerning to her that, even if Ms. Drumhiller's behavior was due to alcohol intoxication, his behavior toward her did not stop. Ms. Blackwell did not disclose anything else that had been observed that evening.

3.28 After the June 14 meeting, Ms. Drumhiller asked about the next steps. Ms. Blackwell explained that human resources would continue to proceed with its investigation, and she followed up with an email saying: "Thank you for taking the time to talk to me today. I know that was not an easy conversation, and ***I appreciate your candidness and openness***." Interestingly, Ms. Blackwell never mentioned to Ms. Drumhiller that she also served as the faculty Title IX coordinator.

**E. APUS Places Ms. Drumhiller on Administrative Leave and Promptly Fires Her.**

3.29 Following that meeting, Ms. Drumhiller flew home across the country arriving in Pullman, Washington shortly after midnight on Thursday, June 15. While traveling home, she received an email with information about the Employee Assistance Program and then another email from APUS's legal department with a notice of preservation.

3.30 On the morning of Thursday, June 15, Ms. Drumhiller promptly responded to the email from the legal department asking about the steps she needed to take to comply with their request. Ms. Blackwell also requested a virtual meeting at 7:30 a.m. PDT during which she placed Ms. Drumhiller on paid administrative leave.



CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

3.31 Now that she was back home, Ms. Drumhiller scheduled an appointment with her primary care physician. On Friday, June 16, Dr. Harris and Ms. Drumhiller discussed what occurred, date rape drug victimization, possibly therapy, and testing for infectious diseases.

3.32 Ms. Blackwell reached back out that same day and requested to speak with Ms. Drumhiller on Tuesday, June 20, at 7:00 a.m. PDT. As soon as the meeting began, Ms. Blackwell and Ms. Tellier terminated Ms. Drumhiller's employment effective immediately without explanation, but said they would permit Ms. Drumhiller to "resign" from her position. Ms. Blackwell confirmed Ms. Drumhiller's personal contact information and promptly ended the call.

3.33 Minutes later, at 7:32 a.m. PDT, Ms. Drumhiller received an email stating:

> Nicole, As communicated, your employment with APUS will end effective today. Please see the attached document, which provides information that you will find helpful. Access to the APUS system will be cut shortly. Please let me know if you wish to resign, by noon ET today.

3.34 APUS did not provide any explanation for the abrupt termination, did not provide any details from its so-called "investigation", and did not offer any support for her victimization given what it then knew about the Vice President and his behavior.

**F. Ms. Drumhiller was Never Assisted by the Title IX Coordinators, and Learns that the Vice President had Attempted to Victimize Others.**

3.35 Despite APUS's website holding out Ms. Blackwell as the Title IX coordinator for faculty, she never disclosed that position or offered Ms. Drumhiller any guidance regarding Title IX and her rights under that law.



CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

3.36 Incidentally, Ms. Drumhiller was also enrolled as a student in a Master's level psychology course but was never contacted by the Title IX coordinator for students, Caroline Simpson.

3.37 APUS never provided Ms. Drumhiller with information on the outcome of the "investigation", information on how the investigation originated, or the opportunity to provide any evidence to respond to the claims made against her. Indeed, the legal department's June 15 email noted that the allegations were "very serious" and "warranted a thorough investigation" but beyond saying that there were allegations of "inappropriate conduct" nothing specific was ever disclosed to Ms. Drumhiller. Indeed, APUS never even informed Ms. Drumhiller she was a target of any allegations or the investigation.

3.38 On June 21, 2023, an APUS administrator informed Ms. Drumhiller that APUS "released" the Vice President.

3.39 Just days later, another APUS administrator informed Ms. Drumhiller that she witnessed and had to intervene physically in four incidents between her female staff members and the Vice President. She stated that she knew that human resources had interviewed at least six other women regarding the Vice President's predatory behavior.

3.40 Following Ms. Drumhiller's June 27 request that APUS provide the reason for her termination, APUS finally responded on July 5 with a short bullet point list of "reasons", which all related to her victimization by the Vice President:

1. Missing Convocation where your presence was required;
2. Inappropriate behavior while on work travel after work event, in presence of several APUS staff;
3. Lack of judgment regarding alcohol consumption requiring two individuals to assist you back to your hotel room to ensure your safety;



CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

4. Inappropriate decision to partake in alcoholic beverages again the following evening (Friday night); and

5. Failure to be forthcoming during the course of the University's investigation.

3.41 Rather than protect Ms. Drumhiller as the victim of a predator, APUS attempted to sweep the problem under the rug by firing her and the Vice President.

## IV. FIRST CAUSE OF ACTION: SEXUAL HARASSMENT IN VIOLATION OF THE WASHINGTON LAW AGAINST DISCRIMINATION, RCW 49.60

4.1 Plaintiff re-alleges and incorporates herein all preceding paragraphs in this Complaint as though set forth in full herein.

4.2 Plaintiff suffered severe sexual harassment while working for APUS.

4.3 Plaintiff is a member of a protected group under RCW 49.60 *et seq.*, based on her sex.

4.4 As described above, Plaintiff was subjected to unwelcome sexual conduct by Defendant APUS's Vice President that created a hostile work environment.

4.5 The hostile work environment sexual harassment Plaintiff suffered while working for APUS negatively affected the terms and conditions of her employment.

4.6 APUS failed to prevent or promptly correct the unlawful sexual harassment Plaintiff suffered while working for APUS.

4.7 As a direct and proximate cause of APUS's actions and inactions, Plaintiff has suffered harms, losses, and damages.

4.8 Plaintiff's harms, losses, and damages include, but are not limited to, lost wages and benefits, lost earning capacity, lost opportunities, damage to her



CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

professional reputation, mental and emotional distress, necessary and reasonable past and future medical treatment, and other damages to be proven at trial.

4.9 Plaintiff's harms, losses, and damages are continuing.

## V. SECOND CAUSE OF ACTION: RETALIATION IN VIOLATION OF RCW 49.60 *ET SEQ.*

5.1 Plaintiff re-alleges and incorporates herein all preceding paragraphs in this Complaint as though set forth in full herein.

5.2 While in APUS's employ, Plaintiff participated in protected and opposition activity by participating in investigations about the Vice President's sexual misconduct and/or sexual harassment.

5.3 APUS took adverse action against Plaintiff including, but not limited to, conducting a sham investigation, placing her on administrative leave, and wrongful termination.

5.4 Plaintiff's protected and opposition activities were a substantial factor in APUS's adverse employment decisions against Plaintiff.

5.5 As a direct and foreseeable result of APUS's unlawful and retaliatory conduct and wrongful discharge of Plaintiff, Plaintiff has suffered both economic and noneconomic damages related to lost wages, significant emotional distress, damage to her reputation, deprivation of APUS's tuition waiver and other benefits, and other harms, losses, and damages to be proven at trial.

5.6 Plaintiff's harms, losses, and damages are continuing.

## VI. THIRD CAUSE OF ACTION: VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681

6.1 Plaintiff re-alleges and incorporates herein all preceding paragraphs in this Complaint as though set forth in full herein.



CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

6.2 Title IX, 20 U.S.C. §1681 makes it unlawful for an education institution to intimidate, punish, discriminate or retaliate against an individual because they file a Title IX complaint or assist with a Title IX action.

6.3 While in APUS's employ, Plaintiff participated in protected and opposition activities by complaining about the Vice President's sexual misconduct with and/or sexual harassment.

6.4 APUS took adverse action against Plaintiff including, but not limited to, conducting a sham investigation, placing her on administrative leave, and wrongful termination.

6.5 Plaintiff's protected and opposition activities were a substantial factor in APUS's adverse employment decisions against Plaintiff.

6.6 As a direct and foreseeable result of APUS's unlawful and retaliatory conduct and wrongful discharge of Plaintiff, Plaintiff has suffered both economic and noneconomic damages related to lost wages, significant emotional distress, damage to her reputation, deprivation of APUS's tuition waiver and other benefits, and other harms, losses, and damages to be proven at trial.

6.7 Plaintiff's harms, losses, and damages are continuing.

## VII. FOURTH CAUSE OF ACTION: WRONGFUL TERMINATION AGAINST PUBLIC POLICY

7.1 Plaintiff re-alleges and incorporates herein all preceding paragraphs in this Complaint as though set forth in full herein.

7.2 Plaintiff was fired for being victimized by the Vice President and in retaliation for participating in the "investigation" regarding the Vice President's sexual harassment and misconduct.

7.3 In the alternative, Plaintiff pleads the claim under the *Perritt* factors.



CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

7.4 Washington has a clear public policy prohibiting retaliation against employees, including Plaintiff, who was the victim of sexual misconduct and/or sexual harassment and participated in an investigation about the same.

7.5 Washington has a clear public policy prohibiting relation against employees, including Plaintiff, who are victims of sexual misconduct and/or sexual harassment and participate in investigations regarding the same.

7.6 APUS terminated Plaintiff's employment because Plaintiff in good faith participated in the investigation about the sexual misconduct and/or sexual harassment she suffered. There is no overriding justification for APUS's misconduct.

7.7 Moreover, Plaintiff is not prohibited from asserting a claim for wrongful termination in violation of public policy by the existence of any exclusive, alternative statutory remedies, regardless of whether or not such statutory remedies are adequate.

7.8 As a direct and foreseeable result of APUS's unlawful and retaliatory conduct and wrongful discharge of Plaintiff, Plaintiff has suffered both economic and noneconomic damages related to lost wages, significant emotional distress, damage to her reputation, deprivation of APUS's tuition waiver and other benefits, and other harms, losses, and damages to be proven at trial.

7.9 Plaintiff's harms, losses, and damages are continuing.

## VIII. REQUEST FOR RELIEF

8.1 All general and special damages sustained by Plaintiff including, but not limited to, backpay, front pay, benefits, a gross-up for negative tax consequences, and emotional distress damages;

8.2 Punitive damages pursuant to statute;

8.3 Reinstatement;



CORR|DOWNS PLLC
100 WEST HARRISON STREET
SUITE N440
SEATTLE, WA 98119
206.962.5040

8.4 Interest calculated at the maximum amount allowable by law, including pre- and post-judgment interest;

8.5 Costs and disbursements pursuant to statute;

8.6 Reasonable attorneys' fees as allowed by law; and

8.7 Any and all additional economic or equitable relief allowed by law or equity as the Court deems appropriate.

## IX. JURY DEMAND

9.1 Plaintiff demands a trial by jury of all issues properly triable by jury in this action.

DATED this 26th day of September, 2023.

CORR|DOWNS PLLC

By *s/ Jacob M. Downs*
Jacob M. Downs, WSBA No. 37982

By *s/ Joseph P. Corr*
Joseph P. Corr, WSBA No. 36584

100 W Harrison St, Suite N440
Seattle, WA 98119
Telephone: 206.962.5040
jdowns@corrdowns.com
jcorr@corrdowns.com

*Attorneys for Plaintiff*